UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

JERRY KNIGHT,                               :

                    Petitioner,          :         **<u>MEMORANDUM DECISION</u>**

          - v -                       :         17-CV-2278 (DC)

JOHN COLVIN, Superintendent,                :
Five Points Correctional Facility,

                            :

                 Respondent.          :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

APPEARANCES:          JERRY KNIGHT
                        Petitioner *Pro Se*
                        12-A-4884
                        Coxsackie Correctional Facility
                        P.O. Box 999
                        Coxsackie, NY  12051

                        ERIC GONZALEZ, Esq.
                        District Attorney, Kings County
                        By:    Howard B. Goodman, Esq.
                               Assistant District Attorney
                        350 Jay Street
                        Brooklyn, NY  11201
                             Attorney for Respondent

CHIN, Circuit Judge:

        In 2012, following a jury trial, petitioner Jerry Knight was convicted of

first-degree assault and second-degree criminal possession of a weapon in connection

with the shooting of Cleveland White.  Knight was sentenced to concurrent prison

terms of twenty-three years for the assault count and ten years for the weapon

possession count, to be followed by five years of post-release supervision. *See* Dkt. 7 at 2. The Appellate Division, Second Department affirmed his convictions, *People v. Knight*, 19 N.Y.S.3d 901 (2d Dep't 2015) ("*Knight I*"), and the New York Court of Appeals denied his application for leave to appeal, *People v. Knight*, 59 N.E.3d 1222 (N.Y. 2016) (Stein, J.) ("*Knight II*").

On March 31, 2017, proceeding *pro se,* Knight filed the instant petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 (the "Petition"). *See* Dkt. 1. Knight argues that (1) he was deprived of his right to counsel because the trial court did not adequately consider his request for new counsel and (2) there is insufficient evidence to support his convictions. Knight also raised two additional claims, which he has asked this Court for permission to withdraw because they are unexhausted. *See* Dkt. 22. The Kings County District Attorney's Office filed its opposition to the Petition on June 14, 2017. *See* Dkt. 7. On February 3, 2023, the case was reassigned to the undersigned.

For the reasons set forth below, Knight's petition is DENIED.

## BACKGROUND

I.   *The Facts[1]*

The evidence at trial established the following:

Knight was a member of the Crips gang. White was a member of the Bloods, a rival gang. White lived in Coney Island, Brooklyn, and had known Knight

---

[1]      The relevant facts are primarily drawn from the affirmation submitted in opposition to the Petition. The recitation of facts set forth in the affirmation are supported by detailed citations to the record, including the trial transcript. *See* Dkt. 7.

from the neighborhood for two or three years.  White only knew Knight by the nickname "Cuda."  In 2010, Knight and White had several negative interactions with each other.  On one occasion, Knight yelled, "What's cracking" to White, which was a sign of disrespect to a Bloods member.  On another occasion, Knight gave White dirty looks, and White, feeling disrespected, challenged Knight to a fight but ultimately walked away.  *See id.* at 19-20.

On May 8, 2011, around 10:00 p.m., White and three friends -- two of whom were fellow Bloods members -- were at a "chicken spot" in Brooklyn and saw Knight standing outside.  Knight "grilled," or looked disrespectfully at, White when they were about four feet away from one another.  White looked at Knight but did not pursue anything further because there were police officers around and he was on probation.  White left the store as Knight was still standing outside, and White started to walk home.  As White was walking, he stopped at a store and saw that Knight, wearing a hoodie, was trailing him.  When White came out of the store, Knight said to White, "What's cracking" to which White responded, "Nothing cracking over here."  White saw Knight walk to the front of White's apartment building, and White walked into his building lobby through the back entrance.  White remained in his building lobby for five to ten minutes, during which he went outside twice and returned to the lobby.  *See id.* at 20-21.

Through the lobby windows, White saw a man wearing a hoodie and standing in front of the apartment building along with two men who he knew as "Peanut" and "Court Knox."  The men left the steps, and White exited the apartment

3

building and followed the men around the corner.  White asked the man wearing the hoodie who he was, and the man responded, "Who are you?"  White recognized the man's voice and called out to a friend.  The man removed the hood, and White saw that it was Knight.  Knight pulled a gun out of the pocket of his hoodie and shot White twice.  White leaned against a nearby U-Haul truck and saw Knight go toward Surf Avenue.  White's friend put him inside a car and took him to the hospital.  *See id.* at 21.

Officers Clive Thomas and Anthony Contessa responded to the scene of the shooting.  White was in the back seat of a car, and the person in the driver's seat told Officer Contessa that White had been shot and that he was going to drive him to the hospital.  Officer Contessa told the driver to wait for the ambulance, but the driver drove the car away.  Officer Thomas followed the car to the emergency room at Coney Island Hospital, but could not speak to White right away because he was in a trauma room and had a tube in his throat.  Meanwhile, Officer Contessa stayed at the crime scene and interviewed witnesses, but later he went to Coney Island Hospital and interviewed White after the tube was removed from his throat.  White told Officer Contessa that he was a member of the Bloods gang and that he could identify the person who shot him.  *See id.* at 21-22.

At 11:35 p.m. the same evening, Officer Thomas Ryley of the Evidence Collection Team responded to the crime scene.  He photographed the scene, recovered two .380 caliber shell casings., and sent them to the laboratory for testing.  *See id.* at 23.

Detective Robert Johnson also went to the scene of the shooting and obtained video surveillance footage of the shooting from NYPD cameras attached to a

building on Surf Avenue.  The video footage was received into evidence but not shown at the trial due to technical difficulties.  *See* Dkt. 7-8 at 51-52.  Detective Johnson testified that in the video he "saw the victim kneeling, or should I say basically kneading himself against a U-haul truck that was parked on the corner of West 21st and Surf."  *Id.* at 52. On May 14, 2011, Detective Johnson went to Coney Island Hospital to interview White. Detective Johnson showed White a photo array from which White identified Knight as the person who shot him.  Detective Johnson issued a warrant card for Knight, and Knight was arrested on June 14, 2011.  *See* Dkt. 7 at 23.

Dr. Tindelo Adaniel treated White at Coney Island Hospital for gunshot wounds in his chest and right arm.  White was in critical condition from life-threating injuries to his lung and liver and remained in the hospital for over a month due to numerous complications that caused permanent limitations.  *See id.* at 23-24.

When White was released from the hospital, he went to his mother's house.  At some point, he met with a Crips gang member named Julani, who was in the same "sect" as Knight and told White not to testify but to "keep it in the streets."  After speaking with Julani, White also spoke with Allen, who informed him that he had been labeled "food" or a "snitch" in Coney Island, meaning he could be beaten up or shot. White felt "scared for [his] life" and stopped staying in Coney Island.  *See id.*

When White left Coney Island, one of his friends called to tell him that Knight and his friends were saying that White snitched because an order of protection had been served on Knight to protect White.  *See id.* at 24-25.  The order of protection, which was served on Knight on August 9, 2011, was received in evidence at the trial.

5

*See id.* at 25 & n.7.  Knight only returned to Coney Island once a month to get money from his mother, and he did not tell the police or the District Attorney's Office where he was staying because he was afraid to testify.  *See id.* at 25; Dkt. 7-6 at 90, 93.  White did not decide to "do the right thing" and testify until July 2, 2012, when he was arrested for failing to report to probation.  He was not promised anything in exchange for testifying.  *See* Dkt. 7 at 25; Dkt. 7-6 at 44-45.

      Officer Peter Contessa of the Department of Corrections Gang Intelligence Unit testified that on March 27, 2012, Knight reported during one of three inmate interviews on file that he was in the "upper-echelon" of the Crips gang.  *See* Dkt. 7 at 25; Dkt. 7-8 at 70, 75-76, 83.  Officer Contessa, an expert on gangs, also testified about recorded phone calls that Knight made from Rikers Island and that were played for the jury.  During the calls, Knight discussed a victim testifying.  In the first phone call made on June 18, 2011 -- four days after Knight was arrested -- Knight used the term "canining," which meant snitching or testifying, and said "don't let him make a movie," which meant that he did not want the victim of the shooting to testify.  In another recorded phone call made on July 3, 2011, Knight used the word "skeleton" to refer to the victim of the shooting, spoke about not letting the victim testify, and said that if the victim comes forward, he might have to carry out an act of violence against him.  In another phone call on May 4, 2012, Knight used the terms "going to church" and "sing," which mean going to court and testifying.  *See* Dkt. 7 at 25-26.

      At trial, White's testimony of the events leading up to the shooting was corroborated by surveillance videos from his building's lobby and outside area, and by

the footage recovered from the building on Surf Avenue.  *See* Dkt. 7-10 at 68.  White also

identified Knight in court as the person who shot him.  *See id.* at 69.

## II.    *Procedural History*

### A.    *State Court Proceedings*

Knight was charged with second-degree attempted murder, first-degree

assault, two counts of second-degree criminal possession of a weapon, and two counts

of fourth-degree criminal possession of a weapon.  Before trial, the weapon possession

counts related to Knight's possession of a loaded firearm at the time of his arrest were

severed from the other charges.  *See* Dkt. 7 at 2.

At the beginning of the trial, defense counsel informed the court that

Knight had asked to be relieved of counsel and appointed new counsel.  The court,

defense counsel, and Knight had the following exchange:

> THE COURT:  What's the reason?
>
> MR. SWEENEY:  I do not have his best interest at stake.  There are certain
> motions he wishes to file to make sure he has all the information
> pertaining to this case that does, in fact, exist and that I think that's
> essentially it.  Right?
>
> THE DEFENDANT:  I have been misguided a few times where he told me
> certain offers on the table, and I wasn't interested at the time, but I asked
> how long it would be available.  He told me until the next offer takes place
> or whatever the case.  When I finally decided to take the offer which he
> presented to me, he told me DA give him, the DA never gave him that
> offer.  He made it seem I made that offer up.  He told me on the phone one
> time, video conference and couple of times he misleaded me by -- I am on
> Court lockdown.  He challenged it very late.  I have been asking him to
> challenge it.

Dkt. 7-2 at 4-5.

The court asked defense counsel if, in his opinion, the motions that Knight had requested him to file were valid. Defense counsel said no. The court responded:

> There would be no reason why a skilled attorney would file motions that aren't properly brought before the Court.
>
> See, young man, you are in a position where you just don't like the situation you put yourself in. And you can't blame the attorney for bad news. Mr. Sweeney is a skilled attorney. He is a highly regarded member of the profession. He is representing you to the best of his ability. And, quite frankly, you're lucky to have such a skilled lawyer representing you.
>
> What you want and what you get in the world are often different things. Now, an attorney is not going to file a motion when it's what we call in our profession frivolous, meaning worthless. It serves no purpose. The district attorney is under a duty to provide you certain documents and evidence before trial. If they fail to do that, you have remedies available to you which your attorney will scrupulously handle.
>
> I find there is no breakdown in the attorney client relationship. You are obviously communicating with one another.
>
> Your motion to have Mr. Sweeney removed and replaced is denied.

*Id.* at 6-7.

The case proceeded to trial. On September 20, 2012, the jury found Knight guilty of first-degree assault and second-degree criminal possession of a weapon. On October 15, 2012, Knight was sentenced to concurrent prison terms of twenty-three years on the assault count and ten years on the weapon possession count, to be followed by five years of post-release supervision.[2] *See* Dkt. 7 at 2.

---

[2]     On November 19, 2012, Knight pleaded guilty to the severed fourth-degree criminal possession of a weapon charge related to the firearm he possessed at the time of his arrest and was sentenced to one year of imprisonment. *See* Dkt. 7 at 3.

8

Represented by counsel, Knight appealed from the judgment of conviction to the Appellate Division, Second Department in June 2014 asserting that 1) the convictions were not supported by legally sufficient evidence and the convictions were against the weight of the evidence; 2) the trial court improperly denied his request for new assigned counsel; and 3) the sentence was excessive.  On December 9, 2015, the Appellate Division affirmed the judgment, rejecting all three claims. *See Knight I*, 19 N.Y.S.3d at 902.

On January 15, 2016, Knight applied for leave to appeal to the New York Court of Appeals, asserting one issue in the application -- that the trial court failed to adequately investigate his request for new counsel.  On April 4, 2016, the New York Court of Appeals denied Knight's application for leave to appeal.  *See Knight II*, 59 N.E.3d at 1222.

**B.      *Proceedings Below***

On March 31, 2017, proceeding *pro se*, Knight filed the Petition raising four claims:  1) deprivation of the right to counsel because the court failed to adequately inquire into his request for new counsel; 2) insufficient evidence to support the convictions; 3) ineffective assistance of trial counsel; and 4) prosecutorial misconduct at trial.  *See* Dkt. 1 at 7-10.  Knight explained that the Petition contains both exhausted and unexhausted claims and asked the court to hold the Petition in abeyance so he could exhaust his ineffective assistance of counsel and prosecutorial misconduct claims.  On June 14, 2017, Respondent opposed the Petition.  *See* Dkt. 7.  On February 12, 2018, the district court denied without prejudice Knight's request to hold the Petition in

9

abeyance, explaining that Knight failed to demonstrate good cause for his failure to

exhaust the claims. *See* Dkt. 12.

On April 13, 2018, Knight submitted another motion requesting that the

Petition be held in abeyance so that he could exhaust the two unexhausted claims:

ineffective assistance of trial counsel and prosecutorial misconduct at trial. *See* Dkt. 17.

On February 11, 2019, the court again denied Knight's motion to stay the Petition

because he failed to demonstrate good cause for failure to exhaust the claims. *See* Dkt.

20.  The court granted Knight sixty days to amend the Petition to remove the

unexhausted claims. *See id.*  On April 11, 2019, Knight filed a motion requesting

permission to withdraw the unexhausted claims from the Petition. *See* Dkt. 22.  That

motion is hereby GRANTED, and the Petition is deemed amended to assert only two

claims:  deprivation of the right to counsel and sufficiency of the evidence.

## DISCUSSION

I.    *Federal Review of State Convictions*

A federal court may not grant a habeas petition on a claim that was

adjudicated on the merits in state court unless that adjudication:

> (1) resulted in a decision that was contrary to, or involved an
> unreasonable application of, clearly established Federal law, as
> determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable
> determination of the facts in light of the evidence presented in the State
> court proceeding.

28 U.S.C. § 2254(d); *see Harrington v. Richter*, 562 U.S. 86, 97-98 (2011); *Waiters v. Lee*,

857 F.3d 466, 477 (2d Cir. 2017).  Hence, when a claim is adjudicated on the merits,

the state court's decision must be accorded "substantial deference." *Fischer v. Smith*, 780 F.3d 556, 560 (2d Cir. 2015). "A federal court may reverse a state court ruling only where it was 'so lacking in justification that there was . . . [no] possibility for fairminded disagreement.'" *Vega v. Walsh*, 669 F.3d 123, 126 (2d Cir. 2012) (per curiam) (quoting *Harrington*, 562 U.S. at 103); *see also Wetzel v. Lambert*, 565 U.S. 520, 524 (2012) (per curiam).

While a defendant has a right to counsel of his choice under the Sixth Amendment, it is not an absolute right. *See United States v. Ostrer*, 597 F.2d 337, 341 (2d Cir. 1979). "It is settled in [the Second Circuit] that once trial has begun a defendant does not have the unbridled right to reject assigned counsel and demand another." *McKee v. Harris*, 649 F.2d 927, 931 (2d Cir. 1981) (cleaned up); *see also United States v. Paone*, 782 F.2d 386, 392 (2d Cir. 1986) ("Absent a conflict of interest, a defendant in a criminal case does not have the unfettered right to retain new counsel, particularly after trial has commenced."). Rather, a defendant's right to counsel must be restrained to prevent manipulation by the defendant or interference with the fair administration of justice. *See McKee*, 649 F.2d at 931.

The Second Circuit uses a four-factor test to evaluate whether a district court abused its discretion in denying a motion to substitute counsel: (1) whether the defendant's motion for new counsel was timely; (2) whether the district court adequately inquired into the matter; (3) whether the conflict between defendant and attorney was so great that it resulted in a total lack of communication preventing an adequate defense; and (4) whether the defendant substantially and unjustifiably

11

contributed to the breakdown in communication. *See United States v. John Doe No. 1,*
272 F.3d 116, 122-23 (2d Cir. 2001). As to the second factor, "where a defendant
voices a seemingly substantial complaint about counsel, the court should inquire
into the reasons for dissatisfaction." *McKee,* 649 F.2d at 933 (internal quotation marks
and citation omitted). "However, if the reasons proffered are insubstantial and the
defendant receives competent representation from counsel, a court's failure to
inquire sufficiently or to inquire at all constitutes harmless error." *John Doe No. 1,* 272
F.3d at 123.

Defendants in a criminal trial may be convicted only upon proof
establishing their guilt beyond a reasonable doubt. *See Jackson v. Virginia,* 443 U.S.
307, 323 (1979). When reviewing a claim that the evidence introduced at trial was
insufficient to sustain a defendant's conviction, the reviewing court applies the
standard set forth in *Jackson* to determine "whether, after viewing the evidence in the
light most favorable to the prosecution, *any* rational trier of fact could have found
the essential elements of the crime beyond a reasonable doubt." *Id.* at 318-19. In
doing so, the court defers to the jury's assessments on both "the weight of the
evidence [and] the credibility of witnesses." *Maldonado v. Scully,* 86 F.3d 32, 35 (2d
Cir. 1996). Furthermore, the court "must look to state law to determine the elements
of the crime." *Ponnapula v. Spitzer,* 297 F.3d 172, 179 (2d Cir. 2002). A "petitioner
bears a very heavy burden in convincing a federal habeas court to grant a petition on
the grounds of insufficiency of the evidence." *Id.* (internal quotation marks and
citation omitted). Indeed, a federal court may overturn a state court decision

rejecting a sufficiency of the evidence challenge only if the state court decision was "objectively unreasonable." *Coleman v. Johnson*, 566 U.S. 650, 651 (2012) (internal quotation marks and citation omitted).

## II.   *Analysis*

Two claims remain in the Petition:  deprivation of the right to counsel and insufficient evidence to support his convictions.  I address the claims in turn.

### A.   *The Right to Counsel*

Knight claims he was denied his constitutional right to counsel because the trial court failed to adequately consider his request for new counsel.  *See* Dkt. 1 at 6.  On direct appeal, the Appellate Division explained that the court did not abuse its discretion by denying Knight's request for new counsel because the court "conducted a sufficient inquiry" and "the defendant's assertions did not suggest the serious possibility of a genuine conflict of interest [or] other impediment to the defendant's representation by assigned counsel." *Knight I*, 19 N.Y.S.3d at 902.  Thus, the Appellate Division concluded that "[t]he Supreme Court did not improvidently exercise its discretion in denying the defendant's request for a new assigned counsel." *Id.*

The Appellate Division's decision is entitled to "substantial deference," *Fischer*, 780 F.3d at 560, and is not unreasonable because Knight's claim fails the Second Circuit's four-factor test.  The first factor is the timeliness of the request.  The Second Circuit has held that a "defendant with assigned counsel cannot decide for no good cause on the eve or in the middle of trial that he will have another attorney

13

represent him." *United States v. Calabro*, 467 F.2d 973, 986 (2d Cir. 1972). Knight requested new counsel after trial proceedings had commenced. Therefore, his request was not timely.

Nor can Knight satisfy the second factor -- that is, showing that the court failed to adequately inquire into the new counsel request. When Knight's counsel informed the court of Knight's request, the court asked why Knight was dissatisfied and allowed both Knight and his counsel to explain. Knight asserted that counsel had misguided him concerning certain plea offers and had been late in challenging a lockdown order issued by a judge. Defense counsel explained that Knight had been put on lockdown by a court order because of allegations that he had contacted and threated witnesses by phone and that the judge denied his challenge to the order on two occasions. *See* Dkt. 7 at 14; 7-2 at 4-5. The court also asked defense counsel if he had reviewed Knight's requests to file various motions and asked defense counsel if, in his professional opinion, he thought the motions were valid. Defense counsel responded that they were not. *See* Dkt. 7-2 at 6. The court considered Knight's and his counsel's explanations and determined that they did not warrant the replacement of counsel. Therefore, the court adequately considered the request.

The third factor is whether the conflict between Knight and his counsel resulted in a total breakdown in communication. Right before telling the court that Knight had requested new counsel, Knight's attorney told the court that he had had numerous discussions about potential pleas with Knight, including discussions

14

about Knight's counteroffer. Counsel's report demonstrated that he maintained

ongoing communication with Knight. *See id.* at 3-4. Accordingly, the court

reasonably concluded that there was no breakdown in the attorney-client

relationship. As to the fourth factor, because there was no breakdown in

communication, whether the defendant contributed to a breakdown in

communication is inapplicable.

Knight has not demonstrated that the court abused its discretion in

denying his motion to substitute counsel. Therefore, the Appellate Division's

decision was not unreasonable, and Knight's first claim fails.

### B.    *Sufficiency of the Evidence*

Knight also argues that the evidence supporting his conviction was

legally insufficient. Knight raised this claim on appeal to the Appellate Division, *see*

*Knight I*, 19 N.Y.S.3d at 901-02, but failed to raise this claim in his application for

leave to appeal to the Court of Appeals, *see* Dkt. 7-10 at 95-97. The application letter,

dated January 15, 2016, does not indicate whether Knight submitted his Appellate

Division briefs along with the application. But even if he had, attaching the

Appellate Division brief to his leave application does not "cure" the fact that the

leave application did not present the insufficiency of the evidence as an issue for

review by the New York Court of Appeals. Indeed, the Second Circuit has rejected

this very argument. *See Grey v. Hoke*, 933 F.2d 117, 120 (2d Cir. 1991) (holding that

two claims discussed in petitioner's Appellate Division brief but not identified in his

letter application to the Court of Appeals were procedurally defaulted, pursuant to

New York's procedural rules, and thus, petitioner was barred from litigating the merits of those claims in the federal habeas proceeding).  Likewise, here, because Knight failed to include his sufficiency-of-the-evidence claim in his application for leave to appeal to the New York Court of Appeals, it is procedurally defaulted.

A federal habeas court may not review the merits of a procedurally defaulted claim, unless the petitioner demonstrates (1) "cause for the default and actual prejudice," or (2) "that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). To establish "cause" for a procedural default, the petitioner must ordinarily show that "some objective factor external to the defense impeded [his] efforts to comply with the State's procedural rule" in state court. *Murray v. Carrier*, 477 U.S. 478, 488 (1986); *accord Clark v. Perez*, 510 F.3d 382, 393 (2d Cir. 2008).  To establish "actual prejudice," a petitioner must show that "errors at his trial . . . worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982).  Finally, to show a "fundamental miscarriage of justice," a petitioner must show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray*, 477 U.S. at 496.

Knight has not met any of these exceptions.  He has not presented any facts showing that there was cause for the procedural default.  Furthermore, he can show neither prejudice nor a fundamental miscarriage of justice.  The Appellate Division held that, "[v]iewing the evidence in the light most favorable to the

prosecution . . . it was legally sufficient to establish the defendant's identity as the perpetrator and his guilt of the crimes of which he was convicted beyond a reasonable doubt." *Knight I*, 19 N.Y.S.3d at 901-02.  The Appellate Division further determined that upon reviewing the record, "the verdict of guilt was not against the weight of the evidence." *Id.* at 902.  The Appellate Division's determination is entitled to substantial deference, and given the evidence presented at trial, the court's determination was not unreasonable.

        The evidence established that Knight and White had previously known each other for two or three years before the shooting, and leading up to the shooting, they had several negative interactions.  They nearly had a fight in 2010, and they had a negative encounter with each other on the night of the shooting.  White saw Knight trailing behind him when he left the chicken spot, and when White exited the store on his way home, Knight asked him "What's cracking?," which was a sign of disrespect.  When White saw the three men from the lobby window, the man that he could not recognize was wearing a hoodie.  When he approached the man and asked who he was, he recognized that it was Knight, and he identified Knight in a photo array and in the courtroom.  Furthermore, the details of his testimony regarding the events before and after the shooting were corroborated by the surveillance videos from White's building lobby and the building on the block where he was shot.  As the Second Circuit has previously held that "the testimony of a single, uncorroborated eyewitness is generally sufficient to support a conviction," White's corroborated testimony is sufficient to support Knight's conviction.  *Edwards v. Jones*,

720 F.2d 751, 755 (2d Cir. 1983) (internal quotation marks and citation omitted).

Lastly, the jury could have reasonably concluded that this shooting motivated

Knight's recorded phone calls.  The evidence supporting Knight's conviction was

legally sufficient, and therefore his second claim fails as well.

## CONCLUSION

Knight has failed to show any basis for relief under 28 U.S.C. § 2254.

Accordingly, the Petition is denied.  Additionally, I decline to issue a certificate of

appealability because Knight has not made a substantial showing of the denial of a

constitutional right.  *See* 28 U.S.C. § 2253.  Pursuant to 28 U.S.C. § 1915(a)(3), I certify

that any appeal taken from this decision and order would not be taken in good faith.

The Clerk of the Court shall enter judgment accordingly and close this case.

The Clerk of Court is respectfully directed to mail a copy of this

memorandum decision and the judgment to Knight at his last address of record.

SO ORDERED.

Dated:      New York, New York
            April 24, 2023

DENNY CHIN
United States Circuit Judge
Sitting By Designation